## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

ABRAHAM GARCIA-RAMOS,

    Plaintiff,

    v.

                            Civil Action No.: SAG-24-522

DR. KASAHUN TEMESGEN,
YES CARE HEALTH SERVICES,

    Defendants.

## MEMORANDUM OPINION

In response to the above-entitled civil rights complaint, Defendants Dr. Kasahun Temesgen and Yes Care Health Services filed a Motion to Dismiss or, Alternatively, for Summary Judgment. ECF No. 16. Plaintiff Abraham Garcia-Ramos opposes the Motion. ECF Nos. 18 and 21. There is no need for a hearing. *See* Local Rule 105.6 (D. Md. 2023). For the reasons that follow, Defendants' Motion, construed as one for summary judgment, shall be granted and judgment entered in their favor.

## BACKGROUND

### A.    Complaint Allegations

Plaintiff is an inmate committed to the custody of the Maryland Division of Correction. He claims that while he was incarcerated at Jessup Correctional Institution ("JCI"), he cut his finger on one of the motor casings in his fan while he was trying to repair it. ECF No. 1 at 4. He was initially seen by a nurse for his injury but states he should have been given additional treatment by a specialist because his finger remained in constant pain and the nurse did not take him seriously. *Id*. Plaintiff recalls being told his finger and hand would be "fine in a short time." *Id*.

When he was finally seen, he was given a date for surgery to repair his hand, but more than one year had passed. *See* ECF No. 1-2 at 1-2 (Med. Record). Due to the passage of time, the surgeon, Dr. Gary M. Sherman, explained that Plaintiff "understands [that it] is highly unlikely that we will get any motion of the DIP joint regardless of the situation." *Id*. at 2. Plaintiff states that between June 1, 2022, and February 2023, he asked countless times to be seen for surgery for his finger. ECF No. 1 at 5. He claims that the surgeon told him that there might not be any use in fixing his finger because too much time had passed. *Id*.

Plaintiff seeks monetary damages as relief. ECF No. 1 at 5.

**B.      Defendants' Response**

Dr. Temesgen provides a declaration stating that he was not Plaintiff's medical provider at JCI, and he was not involved in his care. ECF No. 16-2 at 2, ¶ 5. He explains that he "had no role in submitting, reviewing, or approving any requests for outside orthopedics visits or surgery" for Plaintiff, nor did he review any of Plaintiff's sick call requests regarding his finger. *Id*. Dr. Temesgen further states that he was never made aware that Plaintiff had a finger injury while he was at JCI or that he was denied any treatment that was medically necessary. *Id.* Moreover, because Dr. Temesgen was the Regional Medical Director for the Jessup Region during the relevant time period, he had no involvement in Plaintiff's care at Roxbury Correctional Institution ("RCI"). *Id*. at 1, ¶ 2; at 2 ¶ 5. Notwithstanding his lack of direct involvement in Plaintiff's care, Dr. Temesgen verifies medical records attached as exhibits, which he contends demonstrate that Plaintiff received constitutionally adequate care. *Id*. at 1-2, ¶ 3.

Although Plaintiff implies in his complaint that he injured his finger on June 1, 2022, the medical records indicate that he "first saw a nurse for abrasions on his hands in February 2022, but he later reported to medical staff that he cut himself in May 2022." ECF No. 16-2 at 2, ¶ 6.

On February 16, 2022, Plaintiff was treated for abrasions on his hands by Barbara Peace, RN. ECF No. 16-5 at 34. There was no active bleeding on his hands at that time. *Id.* This does not appear to be the injury that Plaintiff references in his complaint.

On February 23, 2022, Plaintiff submitted a sick call slip stating that on February 16, 2022, he was removed from E Building to B Building with a cut on his pinkie finger. ECF No. 16-8 at 4. He stated that he had told the nurse that he could not move his finger and the nurse had responded that it was because the cut was fresh. *Id.* He stated that he needed to be seen by a doctor because he still could not move his finger and the cut was now five days old. *Id.* There is a notation that Plaintiff was referred to a Physician's Assistant ("PA"). *Id.*

On March 2, 2022, Plaintiff was again seen by RN Peace for his complaint that he had been unable to move his little finger for 20 days. ECF No. 16-6 at 9. That same day, Plaintiff was seen by Nurse Practitioner ("NP") Clarice Aryiku. ECF No. 16-6 at 11-12. NP Aryiku noted that Plaintiff said that he injured his finger in an altercation with another inmate "last month" and "reports inability to bend the finger." *Id.* at 11. She noted that his finger was not swollen and was not bruised ("ecchymosis"), but that he had decreased range of motion ("ROM") of the upper joints in his finger. *Id.* She ordered an x-ray of his finger with two views. *Id.* at 12 and 10. The x-ray report could not be located in Plaintiff's medical file but is noted in other records as showing normal results. ECF No. 16-2 at 4 ¶¶ 9, 10.

On May 28, 2022, PA Emmanuel Esianor diagnosed Plaintiff with a sprained wrist and hand. ECF No. 16-6 at 16. Plaintiff was to continue taking his current medications and if his condition worsened or did not improve within seven days, he was to follow up with medical. *Id.* The only medication listed on this record is Zoloft. *Id.*

On April 5, 2022, Plaintiff submitted a sick call slip stating that something was wrong with his pinkie finger on his right hand "because I can't fist my pinkie with the rest of my fingers." ECF No. 16-7 at 34. He stated that he realized that he did not have any broken bones but said he never claimed to have broken bones. *Id*. He asked to see a different doctor than the one working in the N. Regional Hospital because he did not listen to Plaintiff when he was trying to explain to him about his pinkie. *Id*. Although the sick call was received, there is no indication on the document that it was referred to a provider for processing. *Id*.

Similarly, Plaintiff submitted a sick call slip on April 25, 2022, stating that his pinkie finger on his right hand remains the same after it had been cut more than two months prior and that he could not move it. ECF No. 16-7 at 33. He again asked to see a doctor so that they could find out what was wrong with his finger. *Id*. This sick call slip also bears no indication that he was referred to a provider. *Id*.

On May 4, 2022, Plaintiff submitted a sick call slip stating that his pinkie finger on his right hand was cut three months prior, and he had not received any help for it. ECF No. 16-7 at 32. He explained that he was aware that the x-ray showed he had no broken bones, but he never suspected the bones were broken. *Id*. Rather, he said he was sure that something was wrong with the tendon or nerve in his right hand because it hurts so bad. *Id*. This sick call slip has a notation on it that indicates it was received on May 5, 2022, but there is no indication that it was referred to any provider to be addressed. *Id*.

On June 1, 2022, Plaintiff was transferred from JCI to RCI. ECF No. 16-2 at 4, ¶ 11; ECF No. 16-5 at 20-21. The only medication listed as current on the transfer form was Zoloft. *Id*. at 21. On June 9, 2022, when Plaintiff returned to medical complaining that his finger was painful and

he could not move it, he was given Tylenol for pain and his finger was wrapped to keep it immobilized.[1]  ECF No. 16-5 at 18-19.

Plaintiff continued to complain to medical staff at RCI that he could not move his pinkie finger and it was painful.  In August, Plaintiff submitted a sick call slip requesting to see a doctor for his pinkie finger.  ECF No. 16-7 at 27.  He stated that he could not move his finger and he needed to know what was wrong with it.  *Id*.  On August 8, 2022, four days after Plaintiff submitted his sick call slip, he was seen by RN Virginie Masseh who discontinued Baclofen, noted Plaintiff could not completely bend his pinkie finger, and referred him to a provider for further evaluation. ECF No. 16-5 at 14.

Plaintiff was seen on August 24, 2022, by PA Crystal Jamison.  ECF No. 16-5 at 10-12. Jamison noted that Plaintiff had "absent ROM to right 5th finger from altercation in February."  *Id*. at 11.  Plaintiff reported "that his finger was cut with a piece of metal on the palmar aspect of the PIP joint" and that "[s]ince this injury, patient has been unable to flex finger at MCP or IP joints." *Id*.  Jamison further noted that Plaintiff is "right hand dominant."  *Id*.  Based on that assessment, Jamison referred Plaintiff to an offsite orthopedics practice, Robinwood Orthopedics.  *Id*. at 10. The referral was approved by Utilization Management the next day.  *Id*. at 9.

On September 20, 2022, Plaintiff saw NP Christopher Thomas at Meritus Robinwood Orthopedics.  ECF No. 16-9 at 24-33.  Plaintiff told Thomas he cut himself with a razor four to five months prior and, at the time of his appointment, he was unable to flex the joints in his pinkie finger.  *Id*. at 29.  Another x-ray of Plaintiff's finger showed no fracture, dislocation, or acute osseous abnormality.  *Id*.  Thomas discussed treatment options with Plaintiff, placed Plaintiff in a

---

[1]      This record erroneously references Plaintiff's index finger.  ECF No. 16-5 at 18-19.

"Ortho-Glass splint," ordered an MRI without contrast, and planned to see Plaintiff again after the MRI.  *Id.*

On September 27, 2022, Plaintiff was seen by PA Jamison for a follow-up.  ECF No. 16-5 at 4-5.  She noted that Robinwood Orthopedics had recommended an MRI of his right hand without contrast and therefore referred Plaintiff for an MRI.  *Id.* at 5.  On September 28, 2022, the request for an MRI was approved.  *Id.* at 6.

The MRI was performed on October 17, 2022.  ECF No. 16-9 at 21-22.  The Radiologist's report states that Plaintiff had "high-grade retracted tears of the fifth digit flexor digitorum superficialize and profundus tendons."  *Id.* at 22.

Plaintiff submitted sick call slips requesting to see a doctor about his finger on November 9 and 10 and December 13, 23, and 29, 2022; each time he was referred to a provider with no results.  ECF No. 16-7 at 21, 23, 25; ECF No. 16-4 at 26-30, 33-34.  It was not until January 1, 2023, when Plaintiff saw PA Christopher Brandon, that he was seen for a follow-up regarding his MRI.  ECF No. 16-4 at 20-22.  PA Brandon explained the MRI results to Plaintiff and the plan to refer him back to the orthopedic doctor for evaluation and treatment options.  *Id.* at 22.  Brandon submitted the orthopedic referral request that day.  *Id.* at 18-19.  The request was approved on January 3, 2023.  *Id.* at 23.

Plaintiff was seen by Dr. Manminder Bhatia at Robinwood Orthopedics on January 17, 2023.  ECF No. 16-9 at 14-20.  Dr. Bhatia noted that Plaintiff missed his initial follow-up appointment for the MRI and was now four months late.  *Id.* at 14.  Based on the MRI results, Dr. Bhatia referred Plaintiff to the hand surgeon in his practice for evaluation for surgical intervention.  *Id.* at 17.  Plaintiff had stated that he was interested in having surgery and Dr. Bhatia noted that he had explained what he would likely need to have done and had answered questions.  *Id.*

On February 13, 2023, PA Jamison submitted a consultation request for Plaintiff to be evaluated by a hand surgeon. ECF No. 16-4 at 13-14. The request was approved the following day. *Id*. at 17.

On March 1, 2023, Plaintiff was seen by Dr. Gary Sherman, the orthopedic surgeon, to discuss surgical options. ECF No. 16-9 at 9-13. Dr. Sherman explained to Plaintiff that because it had been "over a year" since his hand was injured, "a direct repair is most likely inconceivable." *Id*. at 11. Dr. Sherman offered Plaintiff three options for repair of the tendons in his hand. *Id*. The first option was to "consider performing a tenolysis and excision of the flexor digitorum profundus to give him more room for flexion." *Id*. The second option was "to attempt a repair as well of the flexor digitorum profundus . . . and the third option would be to perform a reconstruction most likely 1 stage using a palmaris longus tendon graft." *Id*. Plaintiff was not interested in the graft "but would like to see if we can just clean it up and [improve] the motion." *Id*. Dr. Sherman noted that Plaintiff understood that the surgery might not work. *Id*.

On April 28, 2023, PA Jamison submitted a consultation request for the surgery Plaintiff discussed with Dr. Sherman. ECF No. 16-4 at 9-10. On May 2, 2023, Utilization Management denied the request because "medical necessity [was] not demonstrated at this time . . . pain medications have not been trialed consider oral analgesia." *Id*. at 7. After Plaintiff's case was discussed by "Acting Statewide UMMD and RMD," the denial was reversed and Plaintiff was approved for the surgery on May 24, 2023. *Id*. at 6.

Dr. Sherman performed the surgery on July 6, 2023. ECF No. 16-8 at 28-35. Dr. Sherman noted that Plaintiff understood that it was "highly unlikely that we will get any motion of the DIP joint regardless of the situation." *Id*. at 32. In his detailed description of the procedure, Dr.

Sherman states that "[e]xcellent release was achieved." *Id*. at 33. Plaintiff was sent back to RCI following the surgery. ECF No. 16-3 at 28-30.

On July 19, 2023, Plaintiff returned to Robinwood Orthopedics for post-surgical follow-up and was seen by NP Thomas. ECF No. 16-8 at 18-24. Thomas noted that Plaintiff's sutures had been removed by a nurse at RCI the day before his appointment and that the incision looked well. *Id*. at 18. He noted that the incision was healing satisfactorily and provided orders for physical and occupational therapy. *Id*. at 20-21. Plaintiff was to return in six weeks for reevaluation. *Id*. at 21.

On August 14, 2023, Plaintiff saw PA Jamison who noted the results of the follow-up appointment and requested a physical therapy consult for Plaintiff. ECF No. 16-3 at 23-24. She also noted that Plaintiff was to return for a six-week follow-up but stated "will await completion of PT prior to generating follow up ortho request." *Id*. at 23. The request for physical therapy was approved on August 15, 2023. *Id*. at 25.

On August 22, 2023, Plaintiff saw physical therapist Stephen Ryan and told him that he no longer had any pain in his hand but that he did not have active ROM of his finger. ECF No. 16-3 at 18. Ryan gave Plaintiff exercises to do on his own and discharged him from physical therapy. *Id*.

On September 26, 2023, Plaintiff was seen by PA Jamison and reported that he was doing well after his surgery and only experienced pain while working out. ECF No. 16-3 at 16-17. At that time he had been cleared to return to normal activities by the Physical Therapist and the ROM in his finger was improving. *Id*. Jamison noted that there was "no need for ortho follow up at this time." *Id*. at 17. At this time Plaintiff also complained of shoulder pain; Jamison prescribed diclofenac 1% topical gel to apply four times per day to treat the pain. *Id*.

On November 24, 2023, Plaintiff was seen for "continued pain to right 5th finger and right shoulder." ECF No. 16-3 at 13. RN Cynthia L. Benitez referred Plaintiff to a provider for a follow-up and instructed him to continue taking his medications as directed and performing his home exercises as recommended. *Id*. She also advised Plaintiff to refrain from participating in contact sports and lifting weights or anything heavy unless the provider approves that activity. *Id*. In the meantime, Plaintiff was told to apply ice and to rest the area as needed. *Id*.

Defendants contend, alternatively, that based on the described course of care provided to Plaintiff, he received constitutionally adequate care that does not evidence any policy or custom that resulted in a deprivation of Plaintiff's rights. ECF No. 16-1 at 9.

## STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing

law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48 (emphasis in original). The Court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56(a). A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for a court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; a court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261. Because Defendants filed their Motion styled as a motion to dismiss, or in the alternative, for summary

judgment, Plaintiff was on notice that the Court could treat the Motion as one for summary judgment and rule on that basis.

## DISCUSSION

### A.    Personal Participation

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation.  It is well established that the doctrine of respondeat superior does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit).  Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  To state a claim for supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must allege that (1) the supervisor had actual or constructive knowledge that subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff" (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury.  *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

In his Opposition Response, Plaintiff makes it clear that his claim against Dr. Temesgen is based on the fact that he is the RMD for the Jessup region and he is "in charge."  ECF Nos. 18

and 21. His supervisory position alone, however, is not enough to establish liability in a § 1983 claim. Additionally, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. Appx. 279, 282 (4th Cir. 2009). Plaintiff's claim against Yes Care is also based on a theory of respondeat superior and may not proceed.

**B.    Eighth Amendment**

To the extent that Plaintiff's underlying claim could be brought against the proper parties, it still fails. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543. Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S.*

12

*Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).  Proof of an objectively serious medical condition, however, does not end the inquiry.

After a serious medical need is established, a successful claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition.  *See Farmer*, 511 U.S. at 839-40.  "Actual knowledge or awareness on the part of the alleged inflicter … becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

If the required subjective knowledge is established, a defendant may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S.

at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable."). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)); *see also Jackson*, 775 F.3d at 179 (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013).

Much of the delay in treating Plaintiff's finger injury was due to medical staff's apparent misunderstanding of the nature of the injury. Even assuming they were negligent in failing to listen more carefully to Plaintiff's complaint or to examine his injury more closely, "[a] missed diagnosis . . . does not automatically translate into deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (prison physician's misdiagnosis of prisoner who presented clear symptoms of pituitary tumor may support negligence claim, but not Eighth Amendment claim); *see also Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."). Once the nature of Plaintiff's injury was recognized, every effort was taken to ensure he was evaluated and treated by orthopedic specialists so that at least some of the function in his finger could be recovered. Those efforts do not depict prison medical providers who are engaged in wanton infliction of pain on Plaintiff. The bureaucracy that slowed the progression of Plaintiff's care is, unfortunately, a reality of the modern health care system that exists for everyone and does not represent an Eighth Amendment violation.

**CONCLUSION**

Defendants are entitled to summary judgment in their favor.  By separate order which follows, their Motion shall be granted and judgment entered in their favor.


___June 5, 2025___                                  _____/s/_____
Date                                                                    Stephanie A. Gallagher
                                                                             United States District Judge

15